IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

OLIVIA SINGLETON,                         :

        Plaintiff,

    v.                                    :

PSA AIRLINES, INC., *et al.*,

        Defendants.                       :

Case No. 3:19-cv-161

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING DEFENDANT PSA AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT (DOC. #24); DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER STATE CLAIMS BROUGHT AGAINST DEFENDANT WILLIAM MAYFIELD AND DISMISSING THOSE CLAIMS WITHOUT PREJUDICE; JUDGMENT TO ENTER IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFF; TERMINATION ENTRY

---

After being terminated from her position as a flight attendant trainee, Plaintiff, Olivia Singleton, filed suit against PSA Airlines, Inc., and former PSA Airlines employee William "Billi" Mayfield, alleging race and national origin discrimination, hostile work environment based on race, and retaliation. She brings her claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2 and 2000e-3, and Ohio Revised Code Chapter 4112. This matter is currently before the Court on Defendant PSA Airlines' Motion for Summary Judgment, Doc. #24. For the reasons set forth below, the Court sustains that motion and dismisses all claims against PSA Airlines with prejudice.

I.    **Background and Procedural History**

In February of 2018, Plaintiff Olivia Singleton, an African-American female, began PSA Airlines' four-week flight attendant training program.  Defendant William "Billi" Mayfield was her Inflight Training Instructor.  Mayfield, however, had no authority to terminate his students from the training program.  His direct supervisor was Jennifer Cameron, PSA's Supervisor of Inflight Training.  Cameron's supervisor was Andrea Roush, PSA's Manager of Inflight Training.  Roush's supervisor was Debra Hoke, PSA's Director of Inflight Services.

During class on February 22, 2018, just four days into the training program, Singleton repeatedly pressed Mayfield to clarify a question on a homework assignment.  He accused her of being disruptive during class and took her to meet with Jennifer Cameron.  During that meeting, Singleton voiced her displeasure at Mayfield's refusal to answer her question.  She also told Cameron that Mayfield had inappropriately touched her hair during class.  Mayfield then apologized to Singleton, saying that he thought she had something in her hair.  That same morning, Cameron memorialized this discussion in an email message to Andrea Roush.  Doc. #23, PageID##1054-56.

Later that day, Singleton again met with Cameron, outside of Mayfield's presence, to address additional concerns.  She told Cameron that when Mayfield touched her hair, he said that "black people are not supposed to have soft hair because they only wear weaves and glue."  She also told Cameron that, on another occasion, Mayfield asked her if she had "just rolled out of bed," an

2

apparent reference to the fact that she was wearing her hair in an afro style that day.  Doc. #31-1, PageID#1831.

Cameron did not tell Mayfield about this second conversation with Singleton. Doc. #22, PageID#454.  As discussed in greater detail below, there is conflicting evidence about whether Cameron informed Andrea Roush of this second conversation.  Singleton alleges that Mayfield continued to make racist comments and touched her hair on another occasion.  However, it is undisputed that Singleton lodged no other complaints about him with Cameron or anyone else.

Singleton maintains that, after she complained to Cameron about Mayfield, he retaliated against her.  On February 27th, he reported to Cameron and Roush that Singleton was rolling her eyes and becoming more vocal in class.  On February 28th, he reported that she interrupted him and complained about some of the training.  In a separate email that same evening, Mayfield reported "recurring issues with attitude from Olivia.  She speaks aggressively to instructors, and doesn't take direction well."  Doc. #31-2, PageID##1868-70.

Mayfield was not the only instructor who complained about Singleton's behavior.  On March 1st, three separate instructors documented similar concerns. In an email message to Mayfield and Cameron, Assistant Training Instructor Lisa Wulff documented several incidents in which Singleton was confrontational with her during class.  Doc. #31-3, PageID#1873.  In an email message to Cameron and Roush, Assistant Training Instructor Morgan Fussinger complained about Singleton's "unprofessional and unpleasant" attitude.  *Id.* at PageID#1872.

Jennifer Cameron observed and documented Singleton's disruptive behavior during an evacuation drill.  Doc. #23, PageID#1060.  One of Singleton's classmates, Andrea Hardy, also voiced complaints to Cameron about Singleton's disruptive behavior in class that day.  *Id.* at PageID#1061.

On March 1st, Andrea Roush recommended to Debra Hoke that Singleton be terminated from the program for "unprofessional behavior."  Doc. #24, PageID##1132, 1135-36.  Hoke testified that, at that point, she knew nothing about Singleton's complaints about Mayfield.  *Id.* at PageID##1137-38.  Based on Roush's recommendation, Hoke terminated Singleton effective March 2nd.  Doc. #24, PageID##1134-35.

Mayfield was also the subject of numerous complaints by other trainees in Singleton's class.  On March 1st, Lisa Goldberg, who is Jewish, complained that Mayfield had said "Heil Hitler," and performed a Nazi salute and march during class.  Mayfield repeatedly referred to another Jewish student, Jeffrey Epstein, as "Jerry," in apparent reference to Jewish comedian Jerry Seinfeld.  Doc. #31-1, PageID#1832.

That same day, trainee Michelle Armesto Berge met with Cameron, Roush, and HR representative Grant Guigou.  She corroborated Goldberg's reports concerning Mayfield's anti-Semitic behavior.  She also told them that Mayfield instructed them not to talk like they were "white trash."  Mayfield made jokes about a Catholic rosary and belittled people with disabilities, calling one trainee "Ms. Tourette's."  During a CPR training exercise in which students were given

4

white and black baby dolls, Mayfield told one student that she "had a black baby" and "they can't swim." *Id.* He also joked about a former trainee who had died during a previous training class, and called older coworkers by derogatory names. *Id.*

On March 8, 2018, Roush and Cameron conducted a further investigation and confirmed these complaints about Mayfield. They also learned of another incident in which Phillip Duclas, an African-American trainee, was practicing hand signals at the back of the aircraft during an emergency evacuation drill. Mayfield commented that "if he wasn't so black, he might be able to see him, but he could only see his eyes and his teeth." *Id.* at PageID#1833.

Debra Hoke terminated Mayfield's employment the following day. Doc. #31-11, PageID#1900. Following Mayfield's termination, another student complained that Mayfield had slammed his hand against the fuselage during a training drill and asked her "what the fuck are you doing," embarrassing her in front of the class. *Id.* at PageID##1832-33.

On March 15, 2018, Andrea Roush sent an email to Hoke expressing her belief that, based on what had transpired with Mayfield, Singleton and two other students who did not complete the class should be offered a spot in another class. Doc. #31-12, PageID#1901. This, however, never materialized.

On May 30, 2019, Singleton filed suit against PSA Airlines and against Billi Mayfield, alleging violations of Title VII and Ohio Revised Code Chapter 4112. The Complaint includes claims against PSA Airlines of race and national origin

5

discrimination (Counts I and II), hostile work environment (Counts III and IV) and retaliation (Counts V and VI) under Title VII and Ohio Revised Code Chapter 4112. Singleton also asserts state law claims of race and national origin discrimination, hostile work environment and retaliation against Mayfield (Counts II, IV and VI). PSA has moved for summary judgment. Doc. #24.[1] That motion is now fully briefed. *See* Docs. ##31, 33.

## II.     Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[1]  On January 11, 2021, the Court overruled Defendant Mayfield's motion for leave to file an untimely motion for summary judgment. Doc. #37.

250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties.  Fed. R. Civ. P. 56(c)(3).  "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990).  If it so chooses, however, the court may also consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).

III.    **Analysis**

Singleton's claims against PSA Airlines are brought under Title VII of the Civil Rights Act of 1964 ("Title VII") and Ohio Revised Code Chapter 4112. Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Another subsection of Title VII prohibits an employer from retaliating against an employee for opposing discriminatory employment practices.  *See* 42 U.S.C. § 2000e-3(a).

Likewise, Ohio Revised Code § 4112.02(A) prohibits employers from discriminating "because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person."  Ohio Revised Code § 4112.02(I) prohibits retaliation for opposing unlawful discriminatory practices.

Claims brought under Chapter 4112 are analyzed in accordance with Title VII. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128, 131 (1981). Accordingly, no separate analysis of the federal and state claims asserted against PSA Airlines is necessary.

In an employment discrimination case, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or by presenting circumstantial evidence from which a jury may infer a discriminatory motive underlying an adverse employment action. *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

If the plaintiff has only circumstantial evidence of a discriminatory motive, claims are analyzed under the framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of discrimination. The elements of a prima facie case vary somewhat depending on the theory of discrimination being asserted. If the plaintiff is successful in establishing a prima facie case, an inference of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 802-03. If the employer offers evidence of such a reason, the

9

presumption of discrimination drops away. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000).

The plaintiff must then prove by a preponderance of the evidence that the reason offered was pretextual. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the discharge; or (3) the proffered reason was insufficient to motivate the discharge. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 471-72 (6th Cir. 2002) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). The plaintiff has the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against him or her. *Burdine*, 450 U.S. at 253.

At the summary judgment stage, a plaintiff seeking to prove discrimination via indirect evidence "must submit evidence from which a reasonable jury could conclude both that she has established a prima facie case of discrimination and that the defendant's legitimate, nondiscriminatory reason for its action, if any, is pretext for unlawful discrimination." *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007).

### A.    Race Discrimination

In Count I of her Complaint, Plaintiff alleges that PSA Airlines discriminated against her on the basis of race and/or national origin in violation of Title VII. Count II alleges race and/or national origin discrimination in violation of Ohio

Revised Code Chapter 4112. Although Plaintiff alleges that she is African-American, she does not indicate her national origin and appears to abandon this theory of liability in her memorandum in opposition to the motion for summary judgment, Doc. #31. The Court will, therefore, limit its discussion to her allegations of discrimination on the basis of race.

Given that Plaintiff has no direct evidence of race discrimination, the *McDonnell Douglas* burden-shifting analysis applies. In order to establish a prima facie case of race discrimination, Plaintiff must prove that: (1) she is a member of a protected group; (2) she was subject to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside of the protected class or similarly situated non-protected employees were treated more favorably. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002).

PSA admits that Plaintiff can satisfy the first and second elements. In its motion for summary judgment, it argues, however, that she was not qualified for the position, as evidenced by the fact that she was not meeting PSA's legitimate business expectations at the time of her discharge. PSA further argues that Plaintiff cannot show that she was replaced by a person outside the protected class or that similarly-situated non-protected employees were treated more favorably.

Although in its reply brief, PSA appears to abandon its claim that Plaintiff was not qualified for the position, the Court will briefly discuss this element. At the prima facie stage, the "qualification" inquiry rests on purely *objective* criteria

such "the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003). The Court "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Id.* at 574. *See also White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) ("courts engage in impermissible consideration of the defendant's proffered legitimate non-discriminatory reason during the first step of the *McDonnell Douglas* analysis when they cite the defendant's proffered reason in finding that the plaintiff is not qualified for the position."). The fact that PSA accepted Plaintiff into its flight attendant training program is sufficient to show that she was objectively qualified for the position. The Court finds that Plaintiff has satisfied the third element of the prima facie case.

With respect to the fourth element, Plaintiff maintains that she was treated less favorably than similarly-situated non-African-American trainees. PSA argues, however, that Plaintiff has failed to identify any trainee outside of her protected class who engaged in comparable unprofessional behavior but was not terminated from the training program.

Plaintiff's comparators must have been similarly situated in all relevant aspects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). This may include factors such as whether they dealt with the same supervisor and were subject to the same standards, and whether they "engaged in

12

the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

It is undisputed that Plaintiff and her classmates had the same instructors and dealt with the same supervisors, and all were subject to the same standards of conduct. Plaintiff alleges that some of her classmates engaged in similar unprofessional and disrespectful conduct but were not terminated.[2] She maintains that they were issued written infractions, coached or not reported at all, but she was "hastily recommended for termination" with no investigation. Doc. #31, PageID#1819.

The only evidence that Plaintiff offers in support of her claim of disparate treatment is daily email reports that Mayfield sent to Jennifer Cameron and Andrea Roush, complaining about students sleeping in class, not taking notes, talking during a slideshow, having a "sense of entitlement," speaking to instructors in a way that was "quite concerning," and failing to complete homework. Doc. #31-14, PageID##1908-11. These reports specifically identify two students who were issued infractions for failing to complete their homework; Plaintiff was not one of

---

[2] Plaintiff also argues that she was treated less favorably than Billi Mayfield, who engaged in even more egregious unprofessional behavior, yet was given a thorough investigation and a chance to explain his side of the story prior to being terminated. Mayfield, however, is not similarly situated to Plaintiff in all relevant aspects. Not only was he an instructor and she a trainee, but also the conduct at issue is not substantially similar.

them. Doc. #31-14, PageID#1910. However, the email reports do not identify the names or races of the students who engaged in the other problematic behavior.[3]

As PSA notes, Plaintiff has failed to identify *any* of her alleged comparators by name or by race, and has pointed to no specific instance in which a non-African-American trainee engaged in equally egregious conduct, but was not terminated from the training program. The Court finds that Plaintiff has failed to present sufficient evidence from which a reasonable jury could find that any similarly-situated trainee outside the protected class was treated more favorably than she was.[4] Because Plaintiff cannot establish this element of her prima facie case, the Court SUSTAINS PSA Airlines' motion for summary judgment on Counts I and II, Plaintiff's federal and state claims of race discrimination.

_____

[3] Given the separate email messages that Mayfield sent to Cameron and Roush, complaining about Plaintiff's attitude and her tendency to speak aggressively to instructors, it is entirely possible that Mayfield's statements about students having a sense of entitlement and speaking to instructors in a way that was quite concerning referred to Plaintiff herself, and not her classmates.

[4] Jennifer Cameron has stated her belief that Plaintiff's alleged unprofessional conduct, *i.e.*, talking over the instructors, rolling her eyes, *etc.*, was "not abnormal or cause for major concern." Cameron further stated that these behavioral issues "did not warrant termination, and were caused by the environment Mr. Mayfield created." Doc. #31-1, PageID#1835. Although Cameron's beliefs may be relevant to the question of pretext, they, standing alone, do not demonstrate that Plaintiff was treated less favorably than similarly-situated trainees outside of her protected class. Because Plaintiff has not established a prima facie case of race discrimination, the Court does not reach the question of pretext on this claim.

**B.     Hostile Work Environment**

Counts III and IV of Plaintiff's Complaint assert federal and state claims of hostile work environment based on race.  In order to succeed on such a claim, Plaintiff must prove that: (1) she belongs to a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment affected a term, condition, or privilege of employment; and (5) PSA Airlines knew or should have known about the harassment and failed to take action.  *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020).  PSA Airlines argues that, based on the evidence presented, no reasonable jury could find that Plaintiff can satisfy the third, fourth or fifth elements of a prima facie case.

**1.     Harassment Based on Race**

The third element requires Plaintiff to prove that Mayfield's harassment of her was based on her race.  The Sixth Circuit has held that the "conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's [race.]"  *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012).

Plaintiff testified at her deposition that Mayfield "offended everybody in that classroom . . . He talked about Spanish people.  He talked about Jewish people.  He talked about black people.  He talked about a lady that died and made fun of it."  Doc. #21, PageID#214.  Citing *Craddock v. FedEx Corporate Servs., Inc.*, No. 2:17-cv-2780, 2020 WL 2543297 (W.D. Tenn. May 19, 2020), PSA argues that,

because Mayfield was an "equal opportunity harasser," Plaintiff cannot prove that the harassment she experienced was based on her race. The Court disagrees.

In *Craddock*, the plaintiff complained that a coworker harassed her by documenting her "comings and goings," routinely complaining about her to their supervisor, disparaging her to coworkers and verbally harassing her, repeatedly canceling meetings with her and refusing to properly train her. Plaintiff alleged that, even though this conduct was facially neutral, it was, in fact, based on her race. She admitted, however, that the alleged harasser was "equally critical of everyone with whom she worked, no matter the race." *Id.* at *11. The court concluded that because the alleged harasser was "an equal opportunity harasser," harassing others across all racial divides, it could not be said that she was discriminating against the plaintiff on the basis of race. *Id.*

In contrast to *Craddock*, the specific conduct of which Plaintiff complains was not facially neutral. "Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). Here, a reasonable jury could find that, but for the fact that Plaintiff is African-American, Mayfield would not have touched her hair and commented about its texture, or asked her if she had just rolled out of bed when she came to class with her hair in an afro. Accordingly, the fact that Mayfield also harassed other students across other racial divides, does not insulate PSA Airlines from Plaintiff's

16

claim of a racially hostile work environment. The Court finds that a reasonable jury could conclude that Plaintiff was harassed based on her race.

### 2. Severe or Pervasive Conduct

Plaintiff, however, must also prove that, based on the totality of the circumstances, the alleged racial harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation omitted). "To succeed, a plaintiff must show that the work environment was both subjectively and objectively hostile; in other words, that the plaintiff not only perceived the work environment as hostile, but that a reasonable person would have found it hostile or abusive as well." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (citing *Harris*, 510 U.S. at 21-22).

As the Sixth Circuit recently noted in *Khalaf*, a plaintiff alleging a hostile work environment faces a "high bar." 973 F.3d at 485. This is because Title VII is not a "code of workplace civility." *Id.* at 483. Neither "[i]solated incidents (unless extremely serious)" nor "[o]ccasional offensive utterances" are actionable. *Id.* at 486. Factors to be considered in determining whether a plaintiff has cleared the "high bar" for a hostile work environment claim include: (1) the "frequency of the discriminatory conduct"; (2) its severity; (3) whether it is "physically threatening or humiliating, or a mere offensive utterance"; and (4) whether it "unreasonably interferes with an employee's work performance." *Id.* (quotation omitted).

17

In analyzing this element of the prima facie case, "only harassment *based on the plaintiff's race* may be considered."  *Williams*, 643 F.3d at 511 (emphasis in original).  In this case, Mayfield touched Plaintiff's hair, and allegedly told her that black people were not supposed to have soft hair because they "only wear weaves and glue."  Doc. #21, PageID#189.  On another occasion, when she was wearing her hair in an afro, he allegedly asked her if she had just rolled out of bed.  *Id.*  Plaintiff also alleges that Mayfield touched her hair on one other occasion after she complained to Jennifer Cameron.  *Id.* at PageID#196.  It can reasonably be inferred that this incident was also based on Plaintiff's race.

Plaintiff correctly argues that, in determining whether there was a racially hostile work environment, the Court must consider not only statements and conduct that Mayfield directed at her, but also statements Mayfield made to her African-American classmates.  *See Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999) (holding that district court erred in excluding evidence of racial harassment not directed at plaintiff).  As explained in *Chancellor v. Coca-Cola Enterprises, Inc.*, 675 F. Supp.2d 771, 780 (S.D. Ohio 2009) (Weber, J.), "the plaintiff may be subjected to a hostile environment when the employer directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff himself."  Comments directed at other members of the protected class "are relevant not only to whether a work environment was objectively hostile, but also to whether the plaintiff subjectively felt harassed."  *Id.*  However, for such comments to be relevant, the plaintiff must

18

have learned of these incidents during the course of his or her employment. *Id.* at 781.

Plaintiff points to the statement that Mayfield made to Phillip Duclas, one of her African-American classmates, during a drill in which Duclas was practicing hand signals at the back of the plane. Mayfield allegedly commented that "if [Duclas] wasn't so black, he might be able to see him, but he could only see his eyes and his teeth." Doc. #31-1, PageID#1833. Plaintiff testified that Mayfield told Duclas that he needed to raise his hands up higher. Doc. #21, PageID#203.

It is not clear that Plaintiff was present when Mayfield made this comment to Duclas or that she learned about it prior to her termination. She testified that Duclas provided her with a written statement about this incident after she was terminated. *Id.* at PageID##182-83. When asked at her deposition if she was present when this incident occurred, Plaintiff replied, "I would assume so if it was around the time – it was in the same time frame. Yes." *Id.* at PageID#203. She stated that "I think I witnessed that." *Id.*

Jennifer Cameron stated in her Declaration that "Ms. Singleton was present during this class and during this comment." Doc. #31-1, PageID#1833. Nevertheless, in the very next sentence, Cameron stated that she learned of this incident on March 8, 2018, "*a couple of days* after Mr. Mayfield made the comment to Mr. Duclas." *Id.* (emphasis added). Given that Plaintiff was terminated on March 2, 2018, it does not appear that she would have been present when Mayfield made this comment. For purposes of the pending motion,

19

the Court will nevertheless give Plaintiff the benefit of the doubt and will assume that she did witness the incident involving Mr. Duclas or learned about it prior to her termination.

Although Plaintiff testified that Mayfield made comments about black people "all the time," she could not identify any other specific incidents.  Doc. #21, PageID##196-97.  This leaves only the two comments that Mayfield made to Plaintiff about her hair, two instances in which he touched her hair, and Mayfield's comment to Mr. Duclas.

PSA argues that these isolated incidents consist of simple teasing and offhand comments, and that they are neither severe nor pervasive enough to be actionable.  The Sixth Circuit has repeatedly found that significantly more egregious conduct was insufficient to support a claim of hostile work environment. *See, e.g., Williams,* 643 F.3d at 513 (holding that supervisor's racial comments over the course of two days, calling Jesse Jackson and Al Sharpton "monkeys" and saying that black people should "go back to where [they] came from" were "despicable . . . insensitive, ignorant, and bigoted," but were not sufficiently severe or pervasive to create a jury question); *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 766 (6th Cir. 2008) (holding that racial comments, "while certainly unacceptable," were isolated incidents which were not severe or pervasive enough to support a hostile work environment claim); *Long v. Ford Motor Co.*, 193 F. App'x 497, 501-02 (6th Cir. 2006) (holding that "utterly deplorable" racial slurs

20

used by two coworkers on two occasions were not severe or pervasive enough to support claim).

The Court agrees that, based on the totality of the circumstances, no reasonable jury could conclude that Mayfield's alleged racial harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create a racially hostile working environment.

There is no question that it was inappropriate for Mayfield to touch Plaintiff's hair. Plaintiff testified that this made her "very uncomfortable." Doc. #21, PageID#161. Mayfield's accompanying comment, that black people were not supposed to have soft hair because they wear only weaves and glue, was racially offensive. Nevertheless, this comment was not physically threatening or verbally abusive. In fact, Mayfield testified that he intended it as a compliment "because [her hair] was really cute." Plaintiff had pulled her hair up on top of her head and it was "so soft and squishy." He was sorry that this offended her, and apologized for his conduct. Doc. #22, PageID##313, 512-13. Mayfield's other comment to Plaintiff, who was wearing her hair in an afro that day, asking her if she had just rolled out of bed, was also racially offensive, but it did not rise above the level of simple teasing.

Mayfield's comment about only being able to see Mr. Duclas's eyes and teeth at the back of the plane was not only racially insensitive, but understandably humiliating to Duclas and to Plaintiff. Certainly, Mayfield could have offered any necessary constructive criticism to Duclas without mentioning race. Mayfield's

21

comment, however, was a "mere offensive utterance," and was not objectively severe enough to support Plaintiff's claim of a racially hostile work environment.

Based on the evidence presented, the Court finds that no reasonable jury could conclude that the alleged harassment at issue in this case was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21.  Plaintiff, therefore, is unable to establish a prima facie case of a hostile work environment based on race. Accordingly, the Court SUSTAINS PSA Airlines' motion for summary judgment on Counts III and IV of the Complaint.[5]

### C.    Retaliation

In Counts V and VI of her Complaint, Plaintiff alleges that PSA retaliated against her for complaining about Billi Mayfield's alleged race discrimination, in violation of Title VII, 42 U.S.C. § 2000e-3(a), and Ohio Revised Code Chapter 4112.

The Court rejects Plaintiff's claim that she has direct evidence of PSA's retaliatory motive.  "Direct evidence is evidence that proves the existence of a fact

---

[5]  If Plaintiff had established that a racially hostile work environment existed, she would then have to prove that PSA Airlines knew or should have known of the offending conduct and failed to take prompt remedial action. *Jackson*, 191 F.3d at 659.  PSA argues that Plaintiff cannot satisfy this element either.  However, given the Court's finding that Plaintiff is unable to prove that the alleged harassment was severe or pervasive, the Court need not, and does not, address this final element of the prima facie case.

without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004).

Here, Plaintiff testified that Mayfield told the class that he had friends in HR and could have them terminated if they made any complaints about him. Doc. #21, PageID##160, 166. He also allegedly told them that, if they complained, management would believe him over them. Doc. #31-9, PageID#1898. Plaintiff notes that just one week after she complained to Jennifer Cameron about Mayfield's racist comments about her hair, Andrea Roush recommended to Debra Hoke that Plaintiff be terminated for unprofessional conduct. That same day, after meeting with Plaintiff's classmates and learning of additional complaints about Mayfield, Andrea Roush expressed frustration to Grant Guigou, wondering why the students "have to take offense to everything?" Doc. #31-6, PageID#1887.

None of this constitutes direct evidence of retaliation. Multiple inferences are required to reach the conclusion that, because Plaintiff complained to Cameron about Mayfield's racist comments about her hair, Plaintiff was terminated from the training program. The *McDonnell Douglas* burden-shifting analysis therefore applies.

In order to establish a prima facie case of retaliation, Plaintiff must show that: (1) she engaged in activity protected under Title VII; (2) PSA knew of the protected activity; (3) PSA thereafter took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the

adverse employment action. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995-96 (6th Cir. 2009).

A reasonable jury could find that Plaintiff engaged in protected activity by reporting to Jennifer Cameron that Mayfield had touched her hair, made comments about the texture of black people's hair, and made rude remarks about her afro. Given that Cameron was Mayfield's supervisor, PSA is charged with knowledge of those incidents. There is no question that Plaintiff thereafter suffered an adverse employment action when she was terminated from the training program.

At issue is whether a reasonable jury could find a causal connection between the protected activity and Plaintiff's termination. Plaintiff must prove that, "but for" the fact that she engaged in protected activity, she would not have been terminated from the training program. *Univ. of Texas SW Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). PSA argues that Plaintiff cannot satisfy this burden. The Court agrees.

It is true that Plaintiff was terminated just one week after she complained about Mayfield's conduct. Temporal proximity between the protected activity and the adverse employment action is certainly relevant and, where the adverse action occurs "very close in time after an employer learns of a protected activity," this may be sufficient to establish the requisite causal connection. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (holding that causal connection may be established when plaintiff was fired the same day the employer learned that he had filed a charge of discrimination). The Sixth Circuit, however, has

repeatedly cautioned "about the permissibility of drawing an inference of causation from temporal proximity alone." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010). Usually, the temporal proximity must be "coupled with other indicia of retaliatory conduct." *Id.* (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006)).

No "other indicia" exists in this case. PSA contends Plaintiff cannot establish the requisite causal connection because it is undisputed that Debra Hoke, who made the decision to terminate Plaintiff's employment, knew nothing about Plaintiff's complaint to Jennifer Cameron about Mayfield's racist comments. Doc. #28, PageID#1231.

In response, Plaintiff invokes the "cat's paw" theory of liability. Under this theory, a supervisor's retaliatory animus can be imputed to the ultimate decisionmaker, who acts as the "cat's paw," if: (1) the supervisor performs an act motivated by a retaliatory animus that is intended to cause an adverse employment action; and (2) the supervisor's conduct is a proximate cause of that adverse employment action. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350-51 (6th Cir. 2012).

Plaintiff maintains that, in order to retaliate against her for complaining about Mayfield's conduct, Andrea Roush recommended to Debra Hoke that Plaintiff be terminated for "unprofessional conduct." However, because it does not appear that Andrea Roush knew of Plaintiff's complaint to Cameron about Mayfield's

racist comments, no reasonable jury could find that Roush's recommendation was motivated by a retaliatory animus.

It is undisputed that at 10:25 a.m., on February 22, 2018, following her meeting with Plaintiff and Billi Mayfield, Jennifer Cameron sent Andrea Roush a typed synopsis of that discussion. Doc. #23, PageID##802, 1054-56. That conversation, however, primarily concerned Mayfield's refusal to answer Plaintiff's question about the homework that morning. Plaintiff also mentioned, in passing, that she did not like it when Mayfield had patted her hair the previous day. Mayfield apologized, saying that he thought she had something in her hair. *Id.* at PageID##1055-56. Cameron testified that, during this meeting, Plaintiff did not claim that she was being singled out because of her race. Doc. #23, PageID#803. Given that Plaintiff did not complain about racially discriminatory conduct, this first complaint to Cameron cannot be deemed "protected activity."

Later that day, Cameron met with Plaintiff again, outside the presence of Mayfield. *Id.* That is when Plaintiff told her that, when Mayfield touched her hair, he said that "black people are not supposed to have soft hair because they only wear weaves and glue," and that, on another occasion, when Plaintiff had worn her hair in an afro, Mayfield asked her whether she had just rolled out of bed. Cameron construed these complaints to be based on race. *Id. See also* Doc. #31-1, PageID#1831. As such, the complaints that Plaintiff made to Cameron during this second conversation can be deemed "protected activity."

Nevertheless, based on the evidence presented, no reasonable jury could find that Cameron ever told Andrea Roush about this protected activity. Cameron testified that she is "pretty sure" that she emailed Roush a document memorializing this second conversation with Plaintiff as well. Doc. #23, PageID##803-04, 914-17. Said document, if it exists at all, has not been made part of the record.

Cameron also gave inconsistent testimony about meeting with Andrea Roush that day. In her declaration, Cameron stated that, immediately following this second conversation with Plaintiff, she "went to Andrea Roush's office and reported Ms. Singleton's complaints to Ms. Roush. Ms. Roush did not respond to my report and rolled her eyes." Doc. #31-1, PageID#1831. Likewise, at her deposition, Cameron testified that, following her conversation with Plaintiff, she "immediately went upstairs and spoke to Andrea Roush." Doc. #23, PageID#803. However, later in her deposition, Cameron testified, "I don't believe Ms. Roush was there the day this incident transpired with Ms. Singleton. I don't believe she was in the building." Cameron said that she felt comfortable handling this situation by herself without Roush's supervision. *Id.* at PageID#818. Cameron's "internally contradictory deposition testimony cannot, by itself, create a genuine dispute of material fact." *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 449 (6th Cir. 2017).

Cameron's claim, that she reported Plaintiff's complaints of Mayfield's racist comments to Andrea Roush, is not supported by the record. As previously noted,

27

the email message that Cameron is "pretty sure" she sent to Roush has not been made part of the record.  Moreover, Andrea Roush does not remember Cameron coming to her office to report Plaintiff's complaints.  Roush testified that, prior to recommending Plaintiff's termination, she was not aware that Plaintiff had made any complaints about Mayfield.  Roush further testified that she had no conversations with Mayfield about the alleged complaints, and she does not remember conducting any sort of an investigation into those complaints.  Doc. #30, PageID#1632.

Roush's testimony is corroborated by Mayfield. Mayfield testified that he was unaware that Plaintiff had a second, private discussion with Cameron on February 22, 2018.  Doc. #22, PageID#454.  He further testified that Roush told him nothing about any student complaints prior to March 8th, the day before he was terminated.  *Id.* at PageID#496.

Based on the evidence presented, no reasonable jury could find that, prior to recommending Plaintiff's termination, Andrea Roush was aware that Plaintiff had engaged in any "protected activity."  It follows that no reasonable jury could find that Roush, seeking to retaliate against Plaintiff for engaging in said "protected activity," recommended Plaintiff's termination to Debra Hoke.  The "cat's paw" theory of liability is, therefore, inapplicable.

The Court concludes that there is no genuine issue of material fact concerning the alleged causal connection between Plaintiff's complaint about Mayfield's racist comments and her subsequent termination.  No reasonable jury

could find that "but for" the fact that Plaintiff engaged in this protected activity, she would not have been terminated from the flight attendant training program. *Nassar*, 570 U.S. at 362. Accordingly, Plaintiff cannot establish a prima facie case of retaliation and PSA is entitled to summary judgment on this basis.

Even if there were sufficient evidence of a causal connection between the protected activity and the adverse employment action, this would not end the inquiry. The burden would then shift to PSA to articulate a legitimate, non-retaliatory reason for terminating Plaintiff from the training program. PSA maintains that Plaintiff was terminated for unprofessional conduct. There is evidence in the record to support such a finding.

On February 27, 2018, Mayfield reported that Plaintiff and another student had engaged in "eye rolling" and were "starting to become more vocal." Doc. #31-2, PageID#1870. The following day, he complained about Plaintiff's attitude. He reported that she "speaks aggressively to instructors, and doesn't take direction well. . . She has a very this is how it should be way of speaking." *Id.* at PageID#1868.

On March 1, 2018, another instructor, Morgan Fussinger, reported a "questionable" encounter with Plaintiff. She observed Plaintiff, on a break, loudly scoff "Ugh, these people! It is too cold, I have a headache, my stomach hurts, this is stressful, oh my god!" Plaintiff then stormed out of the room. Fussinger stated that Plaintiff's attitude was "unprofessional and unpleasant." Following the break, Fussinger was attempting to reenter the classroom. Because Plaintiff was holding

the door handle, Fussinger smiled at her and said, "excuse me." Plaintiff rolled her eyes and shut the door while Fussinger was trying to open it. Doc. #31-1, PageID#1866.

Also on March 1st, instructor Lisa Wulff reported that Plaintiff was confrontational during class, talking back to her, trying to instruct her classmates over Wulff, and complaining when she was not permitted additional unplanned drills. Doc. #31-3, PageID#1873. The same day, Jennifer Cameron observed Plaintiff shaking her head, rolling her eyes and mouthing words to a briefing while a fellow student was practicing a planned evacuation. When it was Plaintiff's turn to do the exercise, she rolled her eyes and started crying when given constructive criticism. Doc. #23, PageID#1060.

In addition, on March 1st, Andrea Hardy, another trainee, approached Cameron and Mayfield to complain about Plaintiff. Hardy alleged that Plaintiff "is constantly making negative comments under her breath," "is telling everyone that Billi is rude and picking on her," was constantly challenging Lisa Wulff during class, telling classmates that Mimi (another instructor) gave different classes contradictory information, and undermining the instructors. Doc. #23, PageID#1061.

Under the third prong of the *McDonnell Douglas* test, the burden then falls on Plaintiff to prove that the articulated reason for her termination was a pretext for retaliation. Plaintiff does not contend that the proffered reason for her termination had no basis in fact. Rather, she argues that the proffered reason did

30

not actually motivate her discharge or that the proffered reason was insufficient to motivate her discharge.

To prove that the proffered reason did not actually motivate her discharge, Plaintiff must "provide evidence 'which tend[s] to prove that an illegal motivation was *more* likely than that offered by the defendant." *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 82 (6th Cir. 2020) (quoting *Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 9 (6th Cir. 2007)).  Again, the viability of this claim hinges on who was aware of Plaintiff's second, private conversation with Jennifer Cameron. Absent any evidence that the relevant decisionmakers knew of this protected activity, Plaintiff is unable to prove that it is more likely than not that this was the true reason for her termination.

Plaintiff maintains that Mayfield's criticisms about her were either falsified or exaggerated because he knew that she had complained to Cameron about his racially discriminatory conduct.  However, he testified at his deposition that he was unaware of this second, private conversation.  Plaintiff also speculates that instructors Morgan Fussinger and Lisa Wulff complained about her because they were friends with Mayfield, and that Mayfield told them about her complaints to Cameron.  Doc. #21, PageID#165.  However, there is no evidence to support this finding and, if Mayfield was unaware of Plaintiff's second conversation with Cameron, he could not have told Fussinger and Wulff about it.  Likewise, there is no evidence that fellow trainee Andrea Hardy, who also complained about Plaintiff's unprofessional behavior, knew of Plaintiff's conversations with Cameron.

Plaintiff also speculates that Mayfield and Roush were good friends and that Roush was trying to protect him.  However, as discussed above, there is insufficient evidence from which a reasonable jury could find that Roush was aware of the protected activity.

Although Jennifer Cameron obviously knew of Plaintiff's complaints, she was not the decision-maker.  Cameron, in fact, submitted a declaration *in support of* Plaintiff's claims, Doc. #31-1, PageID##1829-36, and testified that she was instructed (presumably by Andrea Roush) to write on the release form that Plaintiff was being terminated for "unprofessional conduct."  Doc. #23, PageID#873. There is no evidence to support a finding that Cameron took any action to retaliate against Plaintiff for complaining about Mayfield's racist behavior.  Based on the foregoing, Plaintiff has not presented sufficient evidence that tends to show that the proffered reason did not *actually motivate* her discharge.

Nor has Plaintiff presented sufficient evidence from which a reasonable jury could find that the proffered reason was *insufficient* to motivate her discharge. This third method of showing pretext usually "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *George v. Youngstown State Univ.*, 966 F.3d 446, 473 (6th Cir. 2020) (Rogers, J., concurring in part and dissenting in part) (quoting *Manzer*, 29 F.3d at 1084).

32

As previously discussed, Plaintiff has identified no trainee outside of the protected class who engaged in substantially identical conduct but was not terminated from the program.  Moreover, prior to being accepted into the training program, Plaintiff acknowledged that she would be on probation for six months and could be separated from employment at will during this time, and that she was required to conduct herself "in a professional manner at all times."  Doc. #21, PageID#254.  On the first day of training, her instructors reviewed professional behavior expectations, which included demonstrating courtesy and respect toward all instructors and fellow trainees.  *Id.* at PageID##147-48.  Plaintiff admitted that it would not be respectful to talk over an instructor, roll her eyes at an instructor or classmate, or to interrupt an instructor who was trying to coach another trainee.  *Id.* at PageID##148-49.

In Plaintiff's defense, Jennifer Cameron submitted a declaration stating that Plaintiff's conduct "was not uncommon" and that the reported issues were not "cause for major concern."  Doc. #31-1, PageID#1835.  She does not believe that Plaintiff's conduct warranted termination.  *Id.*  After Mayfield was terminated, Cameron sent an email message to Grant Guigou and Andrea Roush, stating that "Olivia Singleton was released for unprofessional behavior, and she was released because her and Billi did not get along and for other unprofessional behavior reasons.  I feel that Olivia's attitude and behavior was based on the class environment."  *Id.* at PageID#1867.

33

Andrea Roush then sent an email message to Debra Hoke stating that "[b]ased on all the difficulties and situations with Billi in this class," she thought that Plaintiff and two other students should be offered a spot in another class. "The truth is always somewhere in the middle and if they were unable to perform for academics it may have been due to the contributing factors of the class distractions."  Doc. #31-12, PageID#1901.[6]

It appears that, after learning of all of the complaints from the other students about Mayfield, Andrea Roush came to believe that Plaintiff's "unprofessional conduct" may have stemmed, at least in part, from Mayfield's own unprofessional conduct in the classroom.  Nevertheless, with respect to the question of pretext, the relevant question is whether, *on the date of Plaintiff's termination*, there was sufficient evidence to support that decision.  *See Smith v. Towne Props. Asset Mgmt. Co., Inc.*, 803 F. App'x 849, 852-53 (6th Cir. 2020) (noting that "the only relevant time for measuring pretext" is when the adverse employment decision is made).

It is undisputed that in the days immediately prior to recommending Plaintiff's termination, Roush had fielded numerous complaints from Billi Mayfield, Lisa Wulff, Morgan Fussinger, Jennifer Cameron and Andrea Hardy, all complaining about Plaintiff's attitude and unprofessional behavior during class.  Under the

---

[6]  Notably, Plaintiff was not terminated for academic reasons, but rather for unprofessional behavior.

circumstances presented here, no reasonable jury could find that the reasons proffered for Plaintiff's termination were insufficient to motivate her discharge.

In summary, Plaintiff cannot establish a prima facie case of retaliation, because she cannot show a causal connection between her protected conduct and her termination from the training program. Nor has she presented sufficient evidence to support a finding that the proffered reason for her termination, unprofessional behavior, did not actually motivate her discharge or that it was insufficient to motivate her discharge. Finding no genuine issue of material fact, the Court SUSTAINS PSA Airlines' motion for summary judgment on the retaliation claims set forth in Counts V and VI of the Complaint.

## IV.   Claims Against William Mayfield

Given that the Court has dismissed all federal claims asserted in this action, the Court declines to exercise supplemental jurisdiction over the state claims asserted against Defendant William "Billi" Mayfield. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (holding that if federal claims are dismissed before trial, the state claims should be dismissed as well); 28 U.S.C. §1367(c)(3) (providing that district courts may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction).

Accordingly, the Court DISMISSES all claims against Defendant Mayfield WITHOUT PREJUDICE to refiling in state court.

**V.      Conclusion**

For the reasons set forth above, the Court SUSTAINS Defendant PSA

Airlines, Inc.'s Motion for Summary Judgment, Doc. #24, and DISMISSES all

federal and state claims brought against PSA Airlines WITH PREJUDICE.

The Court declines to exercise supplemental jurisdiction over the state law

claims brought against Defendant William Mayfield (Counts II, IV and VI) and

DISMISSES those claims WITHOUT PREJUDICE to refiling in a state court of

competent jurisdiction.

Judgment shall be entered in favor of Defendants and against Plaintiff.

The captioned case is hereby ordered terminated upon the docket records of

the United States District Court for the Southern District of Ohio, Western Division,

at Dayton.


Date: March 31, 2021                                    _Walter H. Rice_ (tp - per Judge Rice authorization after his review)
                                                        WALTER H. RICE
                                                        UNITED STATES DISTRICT JUDGE